UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TROY PHILLIPS, | ) |
| Plaintiff, | ) |
| vs. | ) No. 1:16-cv-01391-SEB-MPB |
| C. HUFFORD, MICHAEL SMITH, MONICA GIPSON, | ) |
| Defendants. | ) |

**Entry Granting C. Hufford's Motion for Summary Judgment**

For the reasons explained in this Entry, defendant C. Hufford's motion for summary judgment, dkt. [46], is **granted.**

### I. Background

The plaintiff in this 42 U.S.C. § 1983 civil rights action is prisoner Troy Phillips ("Mr. Phillips"). Mr. Phillips at all times relevant to this action was incarcerated at the Correctional Industrial Facility ("CIF"). Mr. Phillips alleges in his complaint that he has been denied treatment for Hepatitis C ("HCV"). The defendants are 1) C. Hufford ("Mr. Hufford"); 2) Michael Smith; and 3) Monica Gipson. Mr. Phillips seeks injunctive relief and compensatory damages.

All three defendants seek resolution of Mr. Phillips' claims through the entry of summary judgment. In this Entry, the Court discusses the motion for summary judgment filed by Mr. Hufford. Mr. Phillips has opposed the motion, dkt. nos. 56-58, Mr. Hufford replied, dkt. 62, and Mr. Phillips filed a surreply, dkt. 66.

## II. Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 127 S. Ct. 1769, 1776 (2007).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 550 U.S. 372, 380 (2007).

## III. Discussion

### A. Undisputed Facts

The following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Phillips as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

*Hepatitis C Standard of Care*

Dr. Renee FallHowe is licensed to practice medicine in Indiana and other states, is board certified in Family Medicine, and is a Certified Correctional Health Professional. Dkt. 48-1, Dr. FallHowe Aff. at ¶ 2. Dr. FallHowe is employed by Corizon, LLC as the Chief Medical Officer.

*Id*. at ¶ 3. In the course of her education, training, and experience, Dr. FallHowe has assessed and treated numerous patients with HCV and she is aware of the standard of care for diagnosing and treating that condition. *Id*. She has never examined Mr. Phillips.

Management and treatment of HCV is a complex, evolving field. *Id.* at ¶ 9. HCV is a virus which over a period of years can cause the patient's liver to become inflamed. *Id.* at ¶ 6. There are two types of HCV: acute and chronic. Acute HCV is a short-term viral infection. Acute HCV can lead to chronic HCV, which may cause the liver to become inflamed and damaged. *Id*.

Acute infection with HCV can be asymptomatic. *Id*. at ¶ 7. For patients who develop an acute HCV infection, 15 to 40 percent clear the virus through the actions of their immune systems. Therefore, approximately 60 to 85 percent of patients progress from acute infection to a chronic infection. Chronic HCV is often asymptomatic as well. The natural history of the effects of chronic HCV is generally slow. Progression of chronic HCV infection to fibrosis and cirrhosis may take years in some patients and decades in others—or, in some cases, may not occur at all. Most complications from HCV occur in patients with cirrhosis. *Id.*

HCV treatment has evolved dramatically. Initially, HCV was treated with one drug that had low success rates. Treatment then evolved to a two-drug regimen with better cure rates. *Id*. at ¶ 8. Then newer antivirals were used in a three-drug regimen with even better success. Now, there are newer medications such as Harvoni with fewer side effects, better cure rates, and fewer contraindications. *Id*.

Medical providers employed by Corizon who work within Department of Correction prison facilities rely on guidelines promulgated by the Bureau of Prisons ("BOP"). *Id*. at ¶ 9. In June 2014, the BOP issued Interim Guidance for the Management of Chronic Hepatitis C. In July 2015, the BOP Guidelines were revised. They were revised again in April 2016 and October

2016 due to ongoing changes in treatments available for patients. *Id.*; *see also* dkt. nos. 48-3, 48-4, 48-5, 48-6.

Patients with chronic HCV infection are enrolled in the prison's medical chronic care clinic, where clinical evaluation and laboratory testing are completed regularly, usually every three or six months. Dkt. 48-1 at ¶ 10. These evaluations include testing to determine liver enzyme elevations and other measurements, which can fluctuate dramatically in HCV patients. Long term liver enzyme changes and other laboratory findings may be indicative of cirrhosis or damage to the liver. *Id.*

Under the June 2014 FBOP Guidelines, patients were prioritized for triple drug therapy based on the advancement of hepatic fibrosis, or cirrhosis, whether the patient is a liver transplant recipient or has a HIV co-infection, or whether the patient has a comorbid medical condition associated with HCV, such as certain types of lymphomas. *Id.* at ¶ 11. Priority was also given if the patient was newly incarcerated and was receiving treatment at the time of incarceration.

The degree of fibrosis may be determined in several ways. The AST-to-platelet ratio index ("APRI") is the BOP-preferred method for non-invasive assessment of hepatic fibrosis and cirrhosis. Liver biopsies and abdominal ultrasounds may also be used to identify findings consistent with cirrhosis. Although the APRI score is useful, it is not an exact predictor of cirrhosis. Sometimes patients with high APRI scores show no signs of fibrosis or cirrhosis on ultrasounds. In June 2014, the BOP recommended prioritizing patients who had APRI scores of 1.0 or greater, or whose APRI score was between 0.7 and 1.0 along with other findings suggestive of advanced fibrosis. *Id.*

In July 2015, the BOP revised its HCV Guidelines to reflect the availability of new treatments and established the new standard of care. *Id*. at ¶ 12. The BOP Guidelines provided that certain cases are at higher risk for complications or disease progression and require more urgent consideration for treatment. The patients at Level 1, or highest priority, are those with known decompensated cirrhosis, liver transplant candidates or recipients, patients with hepatocellular carcinoma, those with comorbid medical conditions associated with HCV, those taking immunosuppressant medications, and newly incarcerated inmates already receiving treatment. Patients at Level 2, or high priority, include those with APRI scores greater or equal to 2.0, those with advanced fibrosis on a liver biopsy, those with Hepatitis B coinfection, those with HIV coinfection, and those with comorbid liver disease. Patients at Level 3, or intermediate priority, include those with APRI scores between 1.5 and 2.0, those with Stage 2 fibrosis on a liver biopsy, those with diabetes mellitus, and those with porphyria cutanea tarda. Patients at Level 4, or routine priority, are those with Stage 0 to Stage 1 fibrosis on liver biopsy, and all other cases of HCV infection that meet the criteria for treatment. *Id*.

In April 2016, the BOP revised its HCV Guidelines to reflect the availability of three new treatment drugs. *Id*. at ¶ 13. The April 2016 Guidelines did not change the way APRI scores are used to prioritize patients for treatment. *Id*.

In October 2016, the BOP priority criteria for HCV treatment was revised and condensed into three categories: high, intermediate, and low priority. *Id*. at ¶ 14. The criteria for Priority Level 1 (high) patients remained unchanged and includes patients with advanced hepatic fibrosis, which may be indicated with an APRI score over 2.0, liver biopsy, or known or suspected cirrhosis; liver transplant recipients; patients with hepatocellular carcinoma; patients with comorbid conditions associated with HCV; and patients already started on treatment. Patients in

Priority Level 2 are considered intermediate priority for treatment. These patients include those with APRI scores equal to or above 1.0; those with Stage 2 fibrosis on a liver biopsy; patients with certain comorbid medical conditions including HBV, HIV, or diabetes; and patients with chronic kidney disease. Patients in Priority Level 3 are considered low priority for treatment. These are patients with an APRI score below 1.0; patients with Stage 0 or Stage 1 fibrosis on a liver biopsy; and all other cases of HCV infection meeting the eligibility criteria for treatment. Exceptions to the criteria for Priority Levels 1-3 are made on an individual basis and are determined primarily by a compelling or urgent need for treatment, such as evidence of rapid progression of fibrosis, or deteriorating health status from other conditions. *Id*.

While Mr. Phillips alleges that he suffers from fatigue, being sick to his stomach, and muscle aches and pains, these symptoms are not indicative of a life-threatening situation, are nonspecific, and may not even be related to his HCV infection. *Id.* at ¶ 15. As HCV is an extremely slow progressing disease, it is Dr. FallHowe's medical opinion that not receiving Harvoni treatment at this time will have no significant effect on Mr. Phillips' HCV infection or his overall condition and health. *Id.* at ¶ 16. There is currently no clinical indication that Mr. Phillips is facing imminent danger or harm resulting from not receiving Harvoni treatment at this time. *Id*.

### *Plaintiff's Medical Records and Treatment*

On December 27, 2013, Mr. Phillips transferred into CIF. That day, a nurse took Mr. Phillips' medical history which included HCV. *Id.* at ¶ 17. On February 11, 2014, he had an annual nurse wellness encounter and denied chest pain, shortness of breath, changes in bowel patterns, or significant weight loss.

On August 29, 2014, Mr. Phillips had labs which showed an AST of 27, ALT of 31, and platelet count of 209. His APRI score was 0.323. *Id*. at ¶ 18. Based on this APRI score, he was considered Priority Level 4, or lowest priority, for treatment. *Id*. On December 10, 2014, he submitted a sick call request complaining of cold symptoms. *Id*. at ¶ 19. On December 12, 2014, he was seen for his symptoms and complained of sinus problems, night sweats, cough, and shortness of breath when lying down. He was assessed with a common cold and cough. On February 24, 2015, he had his annual nurse wellness encounter and denied chest pain, shortness of breath, and black or bloody stools. *Id*.

On October 15, 2015, Mr. Phillips' APRI score was 0.287, and he was still considered Priority 4 for treatment. *Id*. at ¶ 21. On October 27, 2015, he saw Dr. Michael Person for a chronic care clinic visit. *Id*. at ¶ 22. Dr. Person noted that Mr. Phillips thought he might have been treated in 2005 for HCV, but what he described was more likely the HBV vaccination series. Dr. Person added that Mr. Phillips' liver function tests were normal. Mr. Phillips was negative for cough, dyspnea, wheezing, chest pain, irregular heartbeat, abdominal pain, constipation, diarrhea, and vomiting. His physical exam was normal. On October 28, 2015, Mr. Phillips had more labs done, which confirmed he had HCV. *Id*.

On January 20, 2016, Mr. Phillips' APRI score was 0.361, and he remained Priority 4 for treatment. *Id*. at ¶ 24. On March 3, 2016, he had an annual nurse wellness visit. *Id*. at ¶ 25. Mr. Phillips complained of blurry vision and watering eyes but had no other concerns for medical. On March 5, 2016, he saw a nurse for his complaints of headaches and blurry vision when watching television and reading. An eye examination was performed and he was instructed to purchase some reading glasses off commissary, as his results did not qualify him to see the optometrist. *Id*.

Mr. Phillips' April 5, 2016, lab tests revealed an APRI score of 0.419, and he remained a Priority 4 for treatment. *Id.* at ¶ 26. On July 12, 2016, he again had labs, which showed an APRI score of 0.357. *Id.* at ¶ 27. Based on this APRI score, he remained a Priority 4 for treatment. On July 18, 2016, Mr. Phillips saw Dr. Person in the chronic care clinic for his HCV. Mr. Phillips was negative for chronic cough, dyspnea, wheezing, chest pain, edema, irregular heartbeat, abdominal pain, blood in stool, change in stool pattern, constipation, decreased appetite, diarrhea, heartburn, nausea, or vomiting. His physical exam was normal. He had no HCV symptoms. *Id.*

On October 12, 2016, Mr. Phillips' labs yielded an APRI score of 0.413. *Id.* at ¶ 28. Based on this APRI score, he remained a Priority 4 for treatment, which became Priority Level 3, or lowest priority, under the new October 2016 Guidelines. On October 14, 2016, Mr. Phillips saw Dr. Person in the chronic care clinic. He was again negative for cough, chest pain, wheezing, edema, abdominal pain, blood in stool, decreased appetite, diarrhea, heartburn, nausea, and vomiting. His physical exam was normal. He had no HCV symptoms. *Id.*

On December 30, 2016, Mr. Phillips' lab results showed an APRI score of 0.357. *Id.* at ¶ 29. On January 13, 2017, he saw Dr. Person in the chronic care clinic. He was negative for chronic cough, dyspnea, chest pain, irregular heartbeat, edema, abdominal pain, blood in stool, constipation, decreased appetite, diarrhea, heartburn, nausea, and vomiting. His physical exam was normal. There was no indication of HCV symptoms or progressive liver disease. *Id.*

In Dr. FallHowe's medical opinion, Mr. Phillips is receiving appropriate monitoring for his HCV. *Id.* at ¶ 30. He has not reported or displayed any HCV symptoms at all, and his APRI score remains very low, indicating his risk of liver damage is also very low. Although Mr. Phillips alleges he is experiencing fatigue, being sick to his stomach, and muscle aches and

8

pains, there are no medical records corroborating this. There are no records of him requesting medical treatment for these symptoms, and all his examinations with physicians have been normal. Mr. Phillips is currently Priority 3 for medication treatment, which is the lowest priority. *Id*.

### *Plaintiff's Grievance Records and Role of Christopher Hufford*

At all relevant times, Mr. Hufford was the Health Services Administrator ("HSA") at CIF. Dkt. 48-7 at ¶ 2. The HSA is the chief administrative manager of the on-site health services department. *Id*. at ¶ 3. The HSA is accountable for the delivery of contract services and ensuring that Corizon is in compliance with all aspects of the client contract. A part of these duties is to review complaints and consider how a provider's medical decisions relate to directives as written. *Id*. Mr. Hufford is not a licensed physician or medical provider, does not make healthcare decisions, does not see or treat inmates, does not create medical policy for Corizon, and has no role in determining whether an inmate needs any particular medical treatment or medication. *Id*. at ¶¶ 3, 6. Clinical actions regarding health care services provided to inmates, including the decision whether an inmate needs any specific treatment or medication, are the sole responsibility of qualified health care professionals. *Id*. ¶ 6.

On September 25, 2015, Mr. Phillips submitted an informal grievance requesting treatment for his HCV based on lab work he had done the prior year. *Id*. at ¶ 8; dkt. 48-2, p. 26. Mr. Hufford reviewed Mr. Phillips' lab results and responded to the grievance that the results did not indicate that he needed treatment at that time. Dkt. 48-7, at ¶ 8. The August 29, 2014, labs showed an AST of 27, ALT of 31, and platelet count of 209. Based on these results, his APRI score was 0.323, which meant that he would be considered Priority Level 4, or routine priority. *Id*. Mr. Hufford also informed Mr. Phillips that offenders were reviewed by the HCV

Coordinating Committee and candidates for medication treatment were chosen based on lab scores and additional medical factors. *Id.* at ¶ 9.

Mr. Phillips filed a formal grievance on October 2, 2015, requesting the new medication Harvoni to treat his HCV. *Id.* at ¶ 9; dkt. 48-2, p. 27; dkt. 58-3, p. 2. Mr. Phillips stated in his grievance that in 2005-2006, at Pendleton Correctional Facility ("Pendleton") Nurse Practitioner Kelley Carroll started him on treatment consisting of 2-3 Interferon shots. Dkt. 48-2, p. 27; dkt. 58-3, p. 2.

In response, Mr. Hufford noted that the August 2014 lab results suggested that Mr. Phillips would not be a candidate for treatment because his liver enzymes were normal. Since those labs were over one year old, Mr. Hufford informed the treatment team that there was a potential need for another lab draw. A qualified health care provider ordered the labs. Dkt. 48-7, at ¶ 9. Mr. Hufford also explained to Mr. Phillips that the medical provider would review the results and develop a plan of care for HCV at that time if indicated. Mr. Phillips filed an appeal. The appeal was denied, stating that the IDOC and its providers followed the BOP Guidelines for treatment of HCV and had done so for Mr. Phillips. *Id.*; dkt. 48-2, p. 31; dkt. 58-3, p. 1.

On November 22, 2015, Mr. Phillips submitted an informal grievance requesting the results of his lab draw. Dkt. 48-7, at ¶ 10; dkt. 48-2, p. 38. Mr. Hufford responded that his lab results were provided to the doctor for review and if the doctor determined that Mr. Phillips was a candidate for medication intervention, the physician would present it to the HCV Coordinating Committee. Mr. Hufford added that, while Mr. Phillips' scores may not result in further intervention at this time, his treatment would continue to consist of lab draws to determine if he would meet the applicable criteria at a future date. *Id.*

On December 4, 2015, Mr. Phillips submitted a formal grievance requesting the new treatment for his HCV. Dkt. 48-7, at ¶ 10; dkt. 48-2, p. 39. Mr. Hufford reviewed his medical records, consulted with the medical provider, and reviewed the BOP Guidelines. Dkt. 48-7, at ¶ 10; dkt. 48-2, p. 40. Mr. Hufford responded that Mr. Phillips had received monitoring services including lab draws to monitor the presence of symptoms related to HCV. *Id.* Based on the results, he did not meet the criteria used by Corizon and the IDOC that are outlined by the BOP. Mr. Hufford explained that the BOP provides that inmates with APRI scores above 1.5 be prioritized for medication intervention, but Mr. Phillips' most recent APRI score was 0.295, which was well below the score needed to be prioritized. *Id.* Mr. Hufford advised him that he would receive additional monitoring services and that his case would be presented to the HCV Coordinating Committee if he met the criteria in the future. *Id.* Mr. Phillips' appeal was denied because he was being followed in the chronic care clinic for his condition, the facility was correct that IDOC and Corizon follow the BOP Guidelines, and Mr. Phillips did not meet the current criteria for medication intervention. Dkt. 48-7, at ¶ 10; dkt. 48-2, p. 43.

Mr. Hufford's role as HSA was limited to 1) ensuring that Mr. Phillip was being seen for his HCV and was regularly receiving labs to monitor his condition for changes, and 2) educating Mr. Phillips on how he could receive further treatment for any additional issues. Dkt. 48-7, at ¶ 11. Mr. Hufford is not a medical doctor and could not make the decision to prescribe Harvoni or any other medication. *Id.*

### B. Analysis

At all times relevant to Mr. Phillips' claims, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment.

*Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 8374 (1994); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016) (en banc); *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014).

For purposes of summary judgment, the parties do not dispute the first element, that Mr. Phillips has a serious medical condition. The subjective element of a deliberate indifference claim "requires more than negligence and it approaches intentional wrongdoing. The Supreme Court has compared the deliberate indifference standard to that of criminal recklessness." *Burton v. Downey,* 805 F.3d 776, 784 (7th Cir. 2015) (internal citation and quotation omitted). To constitute deliberate indifference, "a medical professional's treatment decision must be such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Petties,* 838 F.3d at 729 (internal quotation omitted).

Mr. Phillips argues that Mr. Hufford was deliberately indifferent to his serious medical condition by refusing to treat his HCV with the Harvoni treatment. He alleges that his HCV has

caused him pain and suffering and that Mr. Hufford was aware of that. He also contends that, contrary to what Mr. Hufford told him, the nurse at Pendleton (Kelley Carroll) told him that he was an "excellent candidate" for HCV treatment. In support of this assertion, Mr. Phillips has submitted a portion of a document dated October 5, 2005, signed by a Kelley Carroll, N.P., in which "excellent candidate" was written in response to the typed question: "Section 9 - Describe any additional considerations that you believe are relevant to a determination of this patient's candidacy for treatment for HC disease:" Dkt. 58-5. Aside from the fact that this document has not been authenticated, of greater significance is that this document was dated in 2005, ten years prior to the circumstances Mr. Phillips alleges in this action, and it is not apparent on what criteria, data, or other circumstances Nurse Carroll's statement was based. HCV treatment modalities have changed over the years.[1]

Mr. Phillips has presented no evidence disputing the BOP Guidelines or his lab test results. Nor has he disputed the fact that Mr. Hufford is not a medical provider. Mr. Hufford responded to Mr. Phillips' grievances after reviewing medical records and/or consulting with medical staff, but he did not make any treatment decisions. Mr. Hufford investigated Mr. Phillips' complaints and recommended that medical staff order more labs in 2015.

The critical point here is that Mr. Hufford cannot be held liable for actions he did not and could not take. Mr. Hufford did not personally deny Mr. Phillips medical care. Rather, he reviewed records and conveyed information. The Seventh Circuit has held that non-medical prison personnel who investigate health related grievances and respond to inmates may rely on

---

[1] While it appears that Mr. Phillips' ALT and AST numbers were higher in 2005, dkt. 72, p. 15, that does not control how he should have been treated in 2014 and 2015 in light of the much lower numbers that were recorded then. In addition, the different test results are consistent with Dr. FallHowe's opinion that liver enzyme elevations and other measurements "can fluctuate dramatically in HCV patients." Dkt. 48-1 at ¶ 10.

the medical judgment of healthcare providers. *See King v. Kramer,* 680 F.3d 1013, 1018 (7th Cir. 2012); *Berry v. Peterman,* 604 F.3d 435, 440 (7th Cir. 2010) (jail administrator who consulted with medical staff, forwarded inmate's concerns to the medical staff, and timely responded to inmate's complaints was entitled to defer to the judgment of jail health professionals "so long as he did not ignore" the inmate). This legal principle defeats Mr. Phillips' claim against Mr. Hufford.[2]

There is overlap between the concept that Mr. Hufford did not participate in providing Mr. Phillips' healthcare and the conclusion that Mr. Hufford could not have been deliberately indifferent to his HCV. While it is clear that Mr. Phillips was dissatisfied with the fact that he was not receiving medication for his HCV, his evidence is not sufficient to create a genuine issue of fact as to whether Mr. Hufford was deliberately indifferent to his medical needs. "[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible." *Arnett v. Webster,* 658 F.3d 742, 754 (7th Cir. 2011). Rather, "he is entitled to reasonable measures to meet a substantial risk of serious harm." *Id.* Even if Mr. Hufford were a medical provider, which he is not, "mere disagreement with a doctor's medical judgment is not enough to support an Eighth Amendment violation." *Cesal v. Moats,* 851 F.3d 714, 722 (7th Cir. 2017) (internal quotation omitted). Even giving Mr. Phillips' document signed by N.P. Carroll every conceivable interpretation in his favor, that notation of him being an "excellent candidate" for

---

[2] Although Mr. Phillips contends that he informed Mr. Hufford that he was experiencing stomach pain caused by his HCV, the Health Care Request Forms he submitted in support of this allegation are not part of his medical record, are not stamped received and signed by nursing staff, and are not authenticated. Dkt. 58-6; dkt. 62-1 at ¶ 6. Moreover, even if these Health Care Requests had been submitted, they would have been received and triaged by nursing staff. Mr. Hufford would not have seen them unless they were part of the medical record and he saw them while investigating a grievance. Dkt. 62-1 at ¶ 5. Mr. Hufford testified in his second affidavit that he never saw those three Health Care Request Forms before Mr. Phillips submitted them in opposition to the motion for summary judgment. *Id.* at ¶ 7.

HCV treatment is incomplete and was made long before the current BOP Guidelines were in place. Therefore, there is no evidence of record that Harvoni treatment in 2014-2015 was appropriate or necessary. No reasonable trier of fact could find, based on this record, that Mr. Hufford, in his administrative role, participated in Mr. Phillips' treatment or was deliberately indifferent to Mr. Phillips' HCV.

### IV. Conclusion

Defendant C. Hufford is entitled to summary judgment on Mr. Phillips' claim of deliberate indifference to a serious medical need. Accordingly, Mr. Hufford's motion for summary judgment, dkt. [46], is **granted.**

The separate Entry discussing the other defendants' motion for summary judgment, issued this day, will direct the issuance of final judgment.

**IT IS SO ORDERED.**


Date: _____8/23/2017_____            _____[signature]_____
                                     SARAH EVANS BARKER, JUDGE
                                     United States District Court
                                     Southern District of Indiana

Distribution:

TROY PHILLIPS, 926868
Miami Correctional Facility
Inmate Mail/Parcels
3038 W. South 250
Bunker Hill, IN 46914

Electronically registered counsel